# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:22-cv-00557-RJC
### (3:18-cr-00099-RJC-DCK-1)

| | |
|---|---|
| **GARLIN RAYMOND FARRIS,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **ORDER** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Respondent.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the following:

1.  Petitioner's Pro Se Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [CV Doc. 1];[1]

2.  Petitioner's Pro Se Motion for Leave to File Oversize Brief [CV Doc. 4];

3.  Petitioner's Pro Se "Motion for Leave to File Petitioner's Memorandum of Law in Support of his 2255 Motion to Vacate, Set Aside, and Correct His Sentence" [CV Doc. 5-1], which the Court construes as a motion to amend his Motion to Vacate;

4.  Petitioner's Pro Se "EX Parte Motion For Order For Production of Billing Details in the Garlin Raymond Farris Criminal Case," [CV Doc. 6];

5.  Petitioner's Pro Se "Motion and Incorporated Memorandum for Leave to Supplement 2255 Motion Pursuant to Federal Rules of Civil Procedure

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 3:22-cv-00557-RJC, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 3:18-cr-00099-RJC-DCK-1.

15(c)(1)(B)," [CV Doc. 8], which the Court construes as a motion to amend his Motion to Vacate; and

6.     Petitioner's Pro Se Motion for Leave to Supplement Exhibits in Petitioner's Reply Brief, [CV Doc. 13].

## I.     BACKGROUND

### A.     Offense Conduct

Between 2016 and 2018, Petitioner Garlin Raymond Farris ("Petitioner"), known as "G," participated in a drug trafficking conspiracy and distributed more than 50 kilograms of methamphetamine, 4,500 grams of marijuana, 56 grams of heroin, and 18 grams of crack cocaine. [CR Doc. 83 at ¶¶ 52-53, 56-57, 59, 74: Presentence Investigation Report (PSR)].  Petitioner operated in several Western North Carolina counties and frequently used others to obtain and deliver large quantities of methamphetamine.  He regularly "fronted" methamphetamine to his high-volume customers.

In the summer of 2016, Michelle Conboy and her boyfriend, Garrett McGuire, began buying ounce quantities of "very pure" methamphetamine from Petitioner every day.  [CR Doc. 90 at 87-88, 90-91].  Petitioner told Conboy that he obtained the methamphetamine from a source in Atlanta.  [CR Doc. 91 at 8].  In the fall of 2016, when McGuire was in jail, Conboy began buying two to four ounces of methamphetamine from Petitioner every day.  [Id. at 9].  Soon thereafter, Conboy and McGuire bought pound quantities of methamphetamine from Petitioner, which he packaged in Tupperware containers.  [Id. at 11].  Conboy and McGuire's neighbor, Brian Storms, also bought methamphetamine from Petitioner.  [CR Doc. 90 at 93-94; CR Doc. 91 at 6-7].  Beginning in 2016, Storms supplied Buddy Martin with methamphetamine.  [CR Doc. 91 at

69-70]. In the summer of 2016, Martin went with Storms to pick up eight ounces of methamphetamine from Petitioner. [Id. at 73].

Two days before Christmas in 2016, Conboy and McGuire got into an argument in front of their home on Wilkinson Boulevard in Charlotte, North Carolina. A neighbor called the police. [Id. at 15, 58-59]. When the police arrive, Conboy began flushing methamphetamine down the toilet. [Id. at 18-19]. Officers found her in the bathroom with two ounces of methamphetamine on the bathroom floor. [Id. at 19-20]. Conboy and McGuire had gotten a pound of methamphetamine from Petitioner two days prior and had sold some of it. [Id. at 14]. Police found another two ounces in Conboy and McGuire's bedroom along with heroin, drug paraphernalia, and a gun. [Id. at 29, 61-62]. Police also found nearly $3,500.00 in cash. [Id. at 63]. When Conboy was detained at the Mecklenburg County Jail, she called Petitioner and tearfully asked him to help her line up bail. [CR Doc. 63 at Gov. 13-a; CR Doc. 91 at 21-23].

Haley Rhodes met Petitioner in 2017. [CR Doc. 91 at 225]. Rhodes initially bought methamphetamine from McGuire and Conboy, but after they were arrested, she began buying methamphetamine from Nicole Johanson, who got her methamphetamine from Petitioner. Johanson got arrested and Petitioner then reached out directly to Rhodes. [Id. at 236, 239]. Petitioner began to sell Rhodes pound quantities of methamphetamine delivered in Tupperware containers. [Id. at 238, 240]. Rhodes too was later arrested. While fleeing police prior to her arrest, Rhodes threw approximately 160 grams of methamphetamine she had purchased from Petitioner out the window of her car. [Id. at 244].

Kevin Mundy bought methamphetamine from Brandon Patton, who bought it from Petitioner. [Id. at 264-66]. On approximately ten occasions, Mundy accompanied Patton when Patton was buying methamphetamine from Petitioner. [Id. at 267]. Eventually, Mundy began

buying methamphetamine directly from Petitioner, buying up to four ounces at a time. [Id. at 268-69].

Petitioner "had a lot of middlemen running for him." [CR Doc. 92 at 18]. Jamar Miller was one. Miller owned a cell phone store next to the tax business Petitioner opened in Charlotte. [CR Doc. 91 at 288]. In February 2017, Miller began working for Petitioner's methamphetamine distribution operation. [Id. at 292]. Petitioner regularly gave Miller bags of methamphetamine with instructions to wait for his phone to ring and make deliveries. [Id. at 294, 296-98]. After Miller was arrested in March 2017, Miller started using a middleman to deliver methamphetamine from Petitioner. [Id. at 302]. Petitioner bought new sim cards every two to three weeks and new phones every month from Miller's store. [Id. at 290]. Petitioner often switched phones with people who sold for him, and Petitioner switched phones with Miller on May 3, 2017, the day Miller was arrested. [CR Doc. 92 at 21-22]. When police searched Miller's home, they found methamphetamine he had gotten from Petitioner in a Tupperware container. [CR Doc. 91 at 306-07].

Silver Jones met Petitioner in 2017. [Id. at 151, 161]. At the time, Jones had been traveling to Atlanta to buy methamphetamine from "Green," whom she had been connected with through her previous supplier, "Angel." [See id. at 141-46, 149]. Jones convinced Storms and Petitioner to use Green to buy methamphetamine. [Id. at 76-77]. Multiple times, Petitioner gave Storms money to buy kilogram quantities of methamphetamine from Green in Atlanta. Storms would travel with Jones and/or Martin to buy Petitioner methamphetamine. [Id. at 76, 78, 84, 88-89, 149-50, 152-56, 163]. At some point, to avoid having to drive to Atlanta, Jones began buying methamphetamine directly from Petitioner, who supplied Jones with kilogram quantities of

methamphetamine, typically meeting Jones in Charlotte for the transactions. [Id. at 158-60, 200, 204].

On the night of June 9, 2017, Jones arranged to get a kilogram of methamphetamine from Petitioner. [Id. at 164, 170]. That night, she called Petitioner to let him know she was on her way to Charlotte from Newton, North Carolina. Petitioner told her he had something to do and asked her to go somewhere for a while, so Jones, who was with her boyfriend, Joseph Mays, went to a Walmart on Independence Boulevard in Charlotte. [Id. at 164-65]. Jones and Mays were together at the Walmart when Petitioner came walking up the aisle. [Id. at 171]. Jones and Petitioner exited the Walmart together. [Id.]. Jones went to Petitioner's car and gave him $18,000.00 in payment for previously fronted methamphetamine. At the same time, Petitioner fronted Jones another kilogram of methamphetamine, which was packaged in a Tupperware container. [Id.].

Jones and Mays left the Walmart. Shortly thereafter, Jones' roommate asked her to get some heroin for him. Jones called Petitioner, who agreed to supply the heroin. [Id. at 172]. Jones texted Petitioner that she was at a Jack in the Box restaurant in Charlotte. Petitioner met her there and sold her 28 grams of heroin. [Id. at 172-73]. As Jones was driving back to Newton, Gordon Killian, a narcotics investigator with the Catawba County Sheriff's Office, and another officer stopped her.[2] [Id. at 173]. Officers found the methamphetamine and heroin, which turned out to be fentanyl, during the stop. [Id. at 174, 176-77]. Jones was arrested and agreed to speak with the officers. [CV Doc. 1-2 at 131]. She explained her drug trafficking activities, including that she had brought the methamphetamine found in her car from Petitioner, whom she called "G," at the Walmart. [Id. at 133].

---

[2] As discussed in more detail below, officers had obtained a warrant to place a GPS tracker device on Jones' car and were able to track her traveling back to Catawba County.

Task Force Officer (TFO) William A. Elliott went to the Walmart a few days later and spoke with Victoria Talton, an assistant manager. She shared surveillance footage from June 9, 2017, with TFO Elliott. [CR Doc. 91 at 218]. Because Talton did not know how to make a copy of the video, TFO Elliott recorded the footage showing Jones, Mays, and "G" at the Walmart on his cell phone. [Id. at 219]. Several days later, on June 20, 2017, TFO Elliott contacted Jason Murphy, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), requesting help in identifying the man Jones said was her main source of supply from a photo grab of Jones and the suspect, known by Elliott only as "G," taken from the Walmart surveillance footage. [CV Doc. 1-2 at 133]. Agent Murphy identified the person in the photograph as Petitioner. [Id.].

On March 5, 2018, nearly eight months later, Petitioner was charged in a criminal complaint with one count of conspiracy to distribute and to possess with intent to distribute at least 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(A); and one count of possession with intent to distribute at least 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a) and 841(b)(1)(A), for conduct occurring between January 2016 and June 9, 2017. [CR Doc. 1: Criminal Complaint]. The next day, Officers arrested Petitioner. [CR Doc. 90 at 18, 49]. Agent Murphy and Detective Jonathan Tobbe, a detective with the Charlotte-Mecklenburg Police Department (CMPD) and a task force officer (TFO) with the Alcohol Tobacco, Firearms and Explosives (ATF), were the first to interview Plaintiff. [Id. at 13-14, 18]. Later in the interview, Detective Riggs, who was also a TFO, and Drug Enforcement Administration (DEA) Special Agents Warren Adamson and Plotz joined the interview. [Id. at 19; CR Doc. 92 at 27, 30].

During the interview, Petitioner admitted to distributing methamphetamine, as well as heroin and marijuana. [CR Doc. 63, Ex. Gov-1-t]. Petitioner spoke about his relationship with Conboy and McGuire. He stated that the day after they were arrested and their residence searched, he went to their house and saw that the lights were out and the front door ajar. Petitioner told the officers that he connected with Brian Storms through Conboy and McGuire because Storms was their neighbor on Wilkinson.

Petitioner told Murphy and Tobbe that he had previously dealt in cocaine and that Brandon Patton got him into methamphetamine, introducing Petitioner to Patton's contacts in Atlanta. One such contact was a young white male named Thomas who Petitioner described as part of the "LGBT community." Petitioner started dealing with Thomas in or around July 2016. Over the course of their dealings, Petitioner picked up an average of two kilograms of methamphetamine from Thomas approximately 25 to 30 times. Petitioner stated that sometimes it was up to four to ten kilograms at a time. Petitioner used rental cars to drive back and forth to Atlanta to pick up the methamphetamine. Petitioner stated that the last time he picked up from Thomas was in October 2017 and, "right now" he was dealing in marijuana and heroin. He would get heroin delivered by mail from Los Angeles, California, to a house in Albemarle, North Carolina, where Petitioner would pick it up and pay the residents for allowing him to do so. Petitioner refused to give the officers the location of that residence.

Petitioner admitted that he sold to Silver Jones a few times, that she wanted Petitioner to meet Green, and that "she came through Brian [Storms]." Petitioner met Green about 30 miles south of Atlanta to purchase methamphetamine. Petitioner did not feel confident dealing with Green and once "grabbed four keys just on the run" and it was no good, so Storms agreed to move it for Petitioner. In the interview, Petitioner also discussed "Jay," who owned a cell phone store

and had moved methamphetamine for Petitioner, and Kevin Mundy, who also sold for Petitioner. [Id.].

After the interview, Tobbe and other officers searched Petitioner's apartment pursuant to a search warrant. [CR Doc. 90 at 40-41]. Petitioner gave the officers a key so that they would not have to break down the door. [Id. at 50]. Petitioner told them where they could find crack cocaine and some "blue pills," and the officers found these items exactly where Petitioner told them they would be. [Id. at 41-43, 50].

### B. Indictment and Appointment of Counsel

On March 20, 2018, a grand jury indicted Petitioner, charging him with one count of methamphetamine trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) (Count Two); one count of possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Three); and one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Four). [CR Doc. 10: Bill of Indictment]. The methamphetamine conspiracy was alleged to have run from January 2016 through in or about June 2017. The possession with intent to distribute methamphetamine and fentanyl charges were alleged to have taken place on or about June 9, 2017. The cocaine charge was alleged to have taken place on or about March 6, 2018. [Id.]. Attorney Joseph Ledford appeared for Petitioner the day he was indicted. [CR Doc. 11].

On June 5, 2018, Petitioner filed a letter he wrote to Ledford with the Court. [CR Doc. 18]. In the letter, Petitioner asserted that Ledford had a conflict of interest "prohibiting [Ledford] from defending [Petitioner] rigorously." [Id.]. Petitioner complained that "[t]o date," Ledford "[had]n't filed one motion or brief in this case" or "talked about strategy." [Id.]. In response to

8

the letter, a magistrate judge conducted an inquiry into status of counsel hearing. [6/12/2018 Docket Entry]. The magistrate judge allowed Ledford to withdraw and, on June 27, 2018, appointed Miranda Mills to represent Petitioner. [6/27/2018 Docket Entry].

**B.** **Franks Hearing**

In November 2018, Petitioner filed a motion for a Franks hearing, alleging that his arrest was illegal because the affidavit in support of the criminal complaint and the arrest warrant contained material omissions and misrepresentations. [CR Doc. 37]. In relevant part, the affidavit provided as follows:

> 9.      On June 9, 2017, the investigator obtained, and executed, an order to install a GPS tracking device on [Jones's] vehicle, a 2006 Dodge Charger. The investigator was then able to observe the GPS tracked vehicle travel to Charlotte, North Carolina, arriving at, approximately 11:10 pm.
> …
> 14.     [Jones] stated that on June 09, 2017, [she] had travelled to Charlotte, North Carolina and met with "**G**" at a Walmart, located 3850 East Independence Blvd. (This information was corroborated by a review of the GPS tracker that had been placed on the Dodge Charger). [Jones] stated that upon meeting with "**G**" [she] was "fronted" the one kilogram of methamphetamine and that [she] paid $300.00 down on one (1) ounce of heroin.

[CR Doc. 1 at 4-5: Criminal Compl. Aff.].

Petitioner asserted that GPS tracker data showed that Jones' vehicle, a 2006 Dodge Charger, was two miles away from the Walmart and never pinged or stopped at the location and that video surveillance from Walmart did not show a drug transaction between Jones and Petitioner. [CR Doc. 37 at 4].

This Court denied the motion for a Franks hearing, noting that it was unclear whether a Franks hearing was appropriate in the context of an arrest warrant, rather than a search warrant, or what evidence was seized because of Petitioner's arrest or whether the Government intended to

use that evidence at trial. [CR Doc. 40 at 2 & n.2]. The Court, nonetheless, examined the merits of Petitioner's motion to decide whether Petitioners' showing warranted an evidentiary hearing. [See id. at 3]. The Court noted all alleged material omissions, including that "GPS tracking activity for the black Dodge Charger shows the vehicle stopping at locations in Charlotte, North Carolina, other than Walmart. GPS tracking activity for the black Dodge Charger directly disputes that the vehicle ever stopped at the Walmart." [Id. at 4 (quoting CR Doc. 37 at ¶ 18)]. The Court concluded that Petitioner had "not made any showing that the alleged omissions were designed to mislead or made in reckless disregard of whether they would mislead the Court." [Id. at 6]. Moreover, the alleged omissions were "not material" and would not have defeated probable cause had they been included in the affidavit. [Id. at 6-7].

### C. Petitioner's Trial

Represented by Mills, Petitioner proceeded to trial. In his opening statement, Petitioner argued that law enforcement had followed him for two years but had not found him with any methamphetamine, heroin, or large amounts of money. [CR Doc. 90 at 12-13]. The jury watched recordings of Petitioner's March 6, 2018 interview with law enforcement and heard testimony from numerous co-conspirators, including Conboy, Martin, Jones, Rhodes, Miller, and Mundy; law enforcement officers, including Tobbe, Adamson, Killian, and Nathan Fisher; and Petitioner himself.

Detective Tobbe testified about his role in the investigation of Petitioner. Tobbe told the jury that in 2016 his task force started to investigate methamphetamine distribution in the Charlotte area, and, in December 2017, the task force interviewed some subjects involved in methamphetamine and heroin distribution there. During these interviews, Tobbe learned that some of the methamphetamine that had been seized from these subjects had been purchased from

Petitioner. [Id. at 17]. Tobbe testified in detail about the March 6, 2018 interview of Petitioner, guiding the jury through the video evidence of the interview, as set out, supra. [See id. at 19-40]. Special Agent Adamson also testified about his participation in the interview. [CR Doc. 92 at 30]. He testified that he had been assigned to investigate drug crimes in both Atlanta and Charlotte, targeting individuals moving a "significant amount of drugs." [Id. at 28-29]. Adamson also testified that Atlanta is a common source of methamphetamine for Charlotte and that he was aware of "Thomas" as a "drug trafficker" in Atlanta before the interview with Petitioner. [Id. at 29, 34-35].

The jury also heard from several individuals who directly or indirectly sold drugs, primarily methamphetamine, for Petitioner. Haley Rhodes testified as follows. She met Garrett McGuire through mutual friends, and they became friends. [CR Doc. 91 at 228]. She bought methamphetamine from McGuire and Conboy, but primarily from McGuire. [Id. at 230]. Rhodes would buy the methamphetamine in Charlotte and bring it back to Watauga County where she lived to sell it. [Id. at 231-32]. Rhodes also grew to know Storms, his girlfriend Josie White, and Nicole Johanson. [Id. at 231]. At the end of 2016, Rhodes stopped buying from McGuire and started buying from Johanson, who was also known as "Blondie," because Johanson gave Rhodes "a better deal." [Id. at 232-33]. Johanson and Rhodes became close friends. [Id. at 233]. Johanson told Rhodes about her relationship with "G" and spoke with him on the phone frequently. [Id. at 235]. Rhodes learned that Petitioner was Johanson's supplier and eventually met him. Petitioner became comfortable being around Rhodes "because he knew how much money [she] was bringing, and [she] was frequently coming to see [Johanson]." [Id.]. Rhodes saw Petitioner deliver drugs stored in Tupperware containers to hotel rooms she shared with Johanson. [Id. at 237-38]. When Johanson got arrested and was incarcerated, Petitioner reached out to Rhodes directly to buy from

him. [Id. at 236]. Petitioner told Rhodes that he could sell to her more cheaply and not to go through Johanson anymore because "she wasn't to be trusted." [Id. at 239]. Rhodes then cut contact with Johanson and started buying methamphetamine directly from Petitioner, who sold it to Rhodes in Tupperware containers. [Id. at 240-41]. Rhodes bought around a pound of methamphetamine from Petitioner each time and bought from him "less than eight times." [Id. at 240, 250]. On March 27, 2017, Rhodes made a trip to Charlotte to purchase a pound of methamphetamine from Petitioner and returned to Watauga County. [Id. at 242-43, 245]. "[L]ocal task force vehicles" followed Rhodes as she made drug deliveries and, after she was alerted to them, she "panicked" and started throwing the methamphetamine out her car window. [Id. at 243-44]. Eventually, she was stopped, her vehicle was searched, and officers were able to recover the drugs she threw out of her car. [Id. at 244].

The jury also heard from Kevin Mundy. He testified that after quitting for some time, Mundy renewed his methamphetamine habit in early 2016 after his mother died. [Id. at 262]. He met Brandon Patton around the same time and bought methamphetamine from him. [Id. at 263-64]. Eventually, Mundy learned that Patton got his methamphetamine from Petitioner because Mundy would take Patton various places to purchase the drugs from Petitioner. [Id. at 265-66]. Mundy drove Patton to purchase drugs from Petitioner about ten times. Petitioner would drive rental vehicles to make these transactions. [Id. at 267-68]. At some point, Mundy started buying methamphetamine directly from Petitioner. [Id. at 268]. At first, he'd buy just a quarter ounce, then up to an ounce, and then up to three and four ounces. [Id.]. Mundy estimated that he bought approximately 16 to 20 total ounces of methamphetamine from Petitioner. [Id. at 269, 277]. On March 14, 2017, Mundy was stopped by the North Carolina Highway Patrol. At the time, Mundy had four ounces of methamphetamine he had purchased from Petitioner on him. [Id. at 269].

Mundy was interviewed by Special Agent Barringer of the Homeland Security agency. He told Barringer about his activities that day and that he had purchased the methamphetamine from Petitioner. [Id. at 269-70]. Mundy went to jail on state charges and was bonded out a couple of weeks later. [Id. at 270]. After Mundy was released, Mundy and Petitioner would use a "go-between guy" to get the drugs from Petitioner to Mundy since Mundy had been "busted and didn't want to put [Petitioner] in jeopardy." [Id. at 270-71]. On May 3, 2017, after Mundy had returned to Taylorsville, North Carolina, from purchasing methamphetamine from the "go-between guy," Agent Murphy went to Mundy's home and questioned him. [Id. at 273]. Mundy agreed to further cooperate with Agent Murphy and Murphy started communicating with the "go-between guy" as if he were Mundy. [Id. at 274].

Jamar "Jay" Miller also testified at Petitioner's criminal trial. He testified as follows. Miller became one of Petitioner's many middlemen. [CR Doc. 92 at 18]. Miller owned a cell phone store that was located next to Petitioner's new tax business. [CR Doc. 91 at 288]. Sometime in the summer of 2016, Miller met Petitioner, who introduced himself as "G," when Petitioner was starting his tax business. [Id. at 288-89]. Petitioner was in Miller's store frequently to buy new phones and sim cards. [Id. at 290]. In about February 2017, when Miller was having medical issues and experiencing financial difficulty, he approached Petitioner and said, "Yo.' I need to make some money." [Id. at 292; CR Doc. 92 at 15]. Miller testified that by that time he knew that Petitioner was distributing drugs. [CR Doc. 91 at 292]. Miller had previously gone with Petitioner to purchase drugs from Brandon Patton. While Miller did not actually see those transactions, he testified that it was obvious what was happening. [Id. at 295-95; CR Doc. 92 at 16-17]. At first, Petitioner gave Miller two Ziploc bags with methamphetamine in them and a phone and told Miller to wait for it to ring. [CR Doc. 91 at 294, 296]. Between February 2017 and early May 2017,

Petitioner made numerous deliveries for Petitioner. [Id. at 297-99]. Miller also dealt in heroin with Petitioner. Miller was supposed to deliver heroin to someone Petitioner referred to as "Catawba County Girl," but never completed that transaction because Miller was arrested on May 3, 2017. [Id. at 299-300]. Petitioner often switched phones with people who sold for him, and Petitioner switched phones with Miller on May 3, 2017, the day Miller was arrested. [CR Doc. 92 at 21-22]. After Miller's arrest, officers searched Miller's home and found a Tupperware full of methamphetamine that he had gotten from the Petitioner. [CR Doc. 91 at 306-7].

The jury also heard from Buddy Martin, who testified about his relationship with Brian Storms and Petitioner. Martin testified that, after making methamphetamine himself for some time, he started buying it from Storms in 2016. [Id. at 68-69]. Martin met Storms on Wilkinson Boulevard when Martin was broke, and Storms was willing to front him. [Id. at 69]. Martin started with seven grams and within a month, Storms was giving him ounces to sell. [Id. at 70]. Storms moved near Martin, and they become good friends and "partners in the whole distributing meth." [Id.]. Eventually, Martin learned that Petitioner was Storms' methamphetamine supplier. [Id. at 71]. At some point, Martin met Silver Jones while he was at Storms' house, where she boasted about being able to buy methamphetamine "cheap" in Atlanta. [Id. at 76]. Martin decided to ride to Atlanta with her and "she came through with the product." [Id.]. He ultimately made this trip to Atlanta "many times" and identified the source in Atlanta as "Angel." [Id. at 76-77]. Martin also testified that on approximately four occasions, he accompanied Storms to Atlanta to buy methamphetamine from Angel for Petitioner. [Id. at 78-79, 89].

Jones testified at Petitioner's trial as follows. When she first started buying methamphetamine locally, rather than travelling to Atlanta to purchase it from Angel and then Green, she bought from Storms, who was supplied by Petitioner. [Id. at 148-50; see id. at 141-

14

46].  Jones first met the Petitioner in Storms' basement when Petitioner brought money for Storms to use to buy methamphetamine for Petitioner in Atlanta.  Jones and Storms traveled together to Atlanta to buy for Petitioner multiple times, collecting upwards of $40,000 to $50,000 from him at a time.  [Id. at 156].  Eventually, Jones dealt directly with Petitioner because Storms could not keep up with Jones' demand.  [Id. at 158].  Initially, Jones bought only a few ounces from Petitioner, but quickly moved up to buying kilos from him.  [Id. at 159-60].  Jones bought directly from Petitioner for approximately three months, meeting in or around Charlotte every week or two during that time.  [Id. at 161; see id. at 200].  During this time, Jones and Petitioner communicated by voice calls and text message.  [Id. at 163-64].

Jones testified about the June 9, 2017 transaction with Petitioner.  [Id. at 164-72].  During Jones' testimony, the Government introduced video and photographic evidence of Petitioner, Jones, and Mays inside the Walmart together and of Petitioner and Jones exiting the Walmart together.  [Id. at 166-70].  Jones testified that she went to the Walmart on Independence Boulevard with Mays because Petitioner told her he had "something to do" before he could meet her.  [Id. at 164].  Jones testified that she was inside the Walmart long enough to shop for paint and that, after some time, Petitioner came "walking up the aisle."  [Id.].  Jones testified that when they left the Walmart, "[w]e went into our cars.  I gave him, like, I think it was $18,000 and he fronted me a kilo of meth."  [Id. at 171].  Jones testified that the transaction occurred at Petitioner's car and that the drugs were packaged in a rectangular Tupperware container wrapped in plastic.  [Id. at 171-72].  Jones also testified regarding the subsequent drug transaction between her and Petitioner at a nearby Jack in the Box in Charlotte.  [Id. at 172].  Jones testified that, as she and Mays returned to Catawba County, she was "blue lighted" and pulled over.  [Id. at 173].  At that point, Jones "knew [she] was already messed up."  [Id.].  She testified that officers found the Tupperware full of

methamphetamine she had just purchased from Petitioner, the suspected heroin she purchased for her roommate from Petitioner at the Jack in the Box, and a firearm in the glove box. [Id. at 174-77].

Jones also testified regarding cell phone records reflecting various communications between her and Petitioner. [Id. at 180]. She testified about a text message she sent to Petitioner on May 31, 2017, in which she said, "Still need to talk to you. It's about what Green said he could do. If you can call me so I can meet with you. I can move any truck that's moving right now." [Id.]. Jones testified that by this message she was communicating that she could "move what he's got" and that by "truck" she meant "any drug." [Id.]. Jones also testified regarding several communications between her and Petitioner on June 9, 2017 setting up the Walmart transaction and then subsequent communications in the early morning of June 10, 2017 to set up the Jack in the Box transaction. [Id. at 182-88].

Nathan Fisher, a Lieutenant with the Catawba County Sheriff's Office, also testified. At the time of Jones' arrest, Fisher supervised the Criminal Investigations Division. One of his duties in that role was conducting forensic downloads or extractions of mobile devices and computers. [Id. at 112]. After Jones' arrest, Fisher extracted data from her cell phone. [Id. at 111]. Fisher described and corroborated the communications Jones testified to having with the Petitioner, including Jones' message to Petitioner that she "can move any truck that's moving right now," and the messages and phone calls between Jones and Petitioner on June 9, 2017, setting up the Walmart drug transaction and the early morning communications on June 10, 2017, coordinating the Jack in the Box transaction. [Id. at 127-134].

Killian, a Catawba County Sheriff's Office narcotics investigator, testified as follows. [Id. at 96-97]. For several weeks prior to June 9, 2017, law enforcement had been investigating Silver

16

Jones and her activities in Catawba County. [Id. at 97]. He testified that law enforcement had placed a "tracker" on Jones' car that allowed them to "track someone's whereabouts, as far as where they are going and coming from." [Id. at 97-98]. Killian testified that, on the evening of June 9, 2017, Killian got a phone call from a confidential informant that led Killian to check the tracker data to see "in real time…that [Jones] was in Charlotte." [Id. at 98-99].

After Jones' meeting with Petitioner at Walmart, officers monitored Jones' return to Catawba County. Killian and another investigator were stopped, sitting in their vehicle, waiting for Jones to drive by. As her vehicle passed Killian's vehicle, Killian and the other investigator pulled out behind her and conducted a traffic stop. Jones was driving and Mays was a passenger. The other investigator conducted a K9 scan of the vehicle. The K9 gave a positive alert for an illegal substance in the vehicle. [Id. at 99]. They searched the vehicle and recovered a pistol, six different cell phones throughout the interior of the vehicle, and approximately 1,093 grams of methamphetamine stored in a Tupperware container wrapped heavily in cellophane inside a red bag. [Id. at 100-01]. The officers also recovered a dosage unit of Oxycodone from Mays and small amounts of methamphetamine and suspected heroin Jones had stored in her bra. [Id. at 102, 109].

The jury also heard from Victoria Talton, the assistant manager at Walmart who provided the video footage of Jones, Mays, and Petitioner to law enforcement. [Id. at 216-17]. Talton testified that typically Asset Protection Associates would assist law enforcement with this sort of evidence, but at the time law enforcement came to obtain the video footage, "asset prevention was unavailable." [Id.]. Talton testified that she provided law enforcement with two clips, one depicting Petitioner, Jones, and Mays "around the housewares area" and one showing Petitioner and Jones exiting the Walmart. [Doc. 91 at 218, 220]. Talton testified that the video was captured by a cell phone camera rather than recorded as an original video because she did not know "how

to burn video." [Id. at 219]. Finally, Talton testified that there are cameras in the parking lot at this Walmart store and that she would have helped the officer look through all available surveillance potentially relevant to a case. [Id. at 220].

Petitioner testified on his own behalf. He testified that he began selling marijuana in March of 2016 and that he has never sold methamphetamine or heroin to McGuire, Conboy, Storms, Rhodes, Jones, or otherwise. [CR Doc. 92 at 42-43, 54]. He testified that Nicole Johanson introduced him to Brandon Patton and Garrett McGuire to expand his marijuana sales. [Id. at 43-44]. Petitioner testified that he never sold McGuire methamphetamine or heroin and that he "never dealt" with Michelle Conboy. [Id. at 44-45]. Petitioner testified that he "suspected" that McGuire and Conboy sold methamphetamine, but he did not "inquire" about their lifestyle. [Id. at 46]. Petitioner further testified that McGuire approached him in July or August of 2016 about selling different drugs. Petitioner "told him that [the] juice wasn't worth the squeeze," meaning that the potential prison sentence was not worth it. [Id.]. Petitioner testified that he met Brian Storms outside of McGuire's house and that he started selling marijuana to Storms. [Id. at 47]. Petitioner later learned the Storms sold methamphetamine. [Id.].

Petitioner also testified about his relationship with Silver Jones. Petitioner met Silver Jones at Storms' house and started selling her marijuana as well. [Id.]. Petitioner testified that on June 9, 2017, he met Jones at Walmart to sell her a pound of marijuana. [Id. at 48]. Petitioner testified that he walked into the Walmart to let her know that he was there. After she paid for her items, he and Jones "walked out together to [Petitioner's] car to the parking lot." He specifically testified that, after they left the store, "[they] went to [his] car so she could look at the product." [Id. at 49]. Petitioner never went to Jones' car. [Id. at 50]. Jones "passed" on the marijuana because it was "too fruity." [Id.]. Earlier that day, Petitioner tried to call Jones several times to tell her that

Storms and his girlfriend Josie White had gotten arrested. At some point that day, Petitioner texted Jones something to the effect of "they got popped on West Boulevard" because he thought Jones would want to know. [Id.].

Petitioner testified that he told Agent Murphy that he sold methamphetamine during his March 8, 2018 interview because he "was trying to get out of jail." [Id. at 55]. Petitioner testified that as "the weed man" he could get Murphy "into the circles where meth is sold." [Id. at 57]. Petitioner testified that he learned all the information he provided during the interview because "people talk…. You overhear conversations about pricing, sources, where it's coming from…. People like to be important, you know, even Silver Jones. She wanted to be this … this very important person." [Id. at 58]. Petitioner further testified that his "goal was to go home that day," so he "started racking [his] brain saying whatever came to it." [Id. at 58-59]. Petitioner testified that he did not know Green or Angel and that he had only heard those names mentioned. [Id. at 75]. He testified that he did not know that Miller was selling drugs to Mundy. [Id. at 62]. Petitioner testified that the crack cocaine that was found at his home after the interview was collateral from a marijuana sale he made where the buyer "didn't have all the money." [Id. at 62, 83]. Petitioner testified that did not know why "everyone [was] pointing the finger at him in this case." [Id. at 64]. He agreed that "it's fair to say [he] lied a lot during [his] interview in March of 2018," but that the jury should believe him now because he is "under oath." [Id.]. Petitioner acknowledged that he received a text message from Silver Jones after the Walmart transaction but testified that he did not meet her at the Jack in the Box and that she must have texted the wrong person. [Id. at 74]. Petitioner testified that "everything [Conboy] testified in this court" was "definitely untrue." [Id. at 83]. Petitioner testified that "towards the end" of the interview he realized that he was not going home and made a comment about "boxing it up and taking the cause

to a jury trial." [Id. at 59]. Petitioner testified that, when he made those comments, "[he] was thinking that [he'd] have [his] day in court. That a jury of [his] peers would find [him] not guilty." [Id.].

During closing arguments, the Government said to the jury, "[y]ou known what, you're also a jury of the government's peers. We expect 12 folks to listen to the evidence and make an impartial decision. We expect that. He has nothing to lose." [CR Doc. 92 at 123]. On April 4, 2019, the jury found Petitioner guilty on Counts One, Two, and Four and acquitted him of Count Three for possession with intent to distribute fentanyl. [CR Doc. 61: Jury Verdict].

### C. Petitioner Seeks New Counsel

On April 8, 2019, Petitioner, through Mills, filed a renewed motion for a judgment of acquittal on Counts One and Two pursuant to Rule 29 of the Federal Rules of Civil Procedure. [CR Doc. 64]. He argued that the Government presented "only speculative evidence and assumptions made by cooperating witnesses," but had produced no large amounts of cash or methamphetamine. [Id. at 2]. The Government opposed the motion, arguing that it had presented substantial evidence of Petitioner's guilt, including testimony from a co-conspirator that she had received a kilogram of methamphetamine from Petitioner shortly before officers seized the drugs and that surveillance footage and phone extraction data corroborated this testimony. [CR Doc. 66 at 2]. The Government also noted that five additional co-conspirators testified that Petitioner had supplied them with methamphetamine and that he admitted to officers that he had possessed and distributed a significant amount of methamphetamine. [Id.].

On June 13, 2019, Petitioner wrote Mills a letter, which he sent to the Court, firing her as counsel and outlining her purported ineffectiveness at trial. [CR Doc. 67]. The Court held a status of counsel hearing on June 28, 2019. [CR Doc. 163]. The same day the Clerk docketed a letter

from Petitioner to the undersigned dated June 18, 2019 in which he complains about Mills' services. [CR Doc. 68]. Petitioner attached 37 pages of exhibits, including various letters he had written to Mills during her representation, some materials related to the <u>Franks</u> hearing, and what appear to be some of Petitioner's handwritten notes from the trial. [<u>Id.</u> at 4-40]. At the hearing, Petitioner argued that Mills had not submitted a stipulation he had made regarding the quality and quantity of drugs, and she did not put into evidence flight records to show that he was not in North Carolina when witnesses testified that they received drugs from him. [CR Doc. 163 at 8-10]. He also argued that Mills did not object to the authenticity of the Walmart video, given that it was recorded on a cell phone. [<u>Id.</u> at 10-11]. Petitioner also complained that Mills did not object to pictures of drugs being admitted without expert testimony that the pictures showed drugs and that she did not call the case agent – Agent Murphy – as a witness, despite Petitioner's request she do so. [<u>Id.</u> at 11-12].

At the hearing, Mills noted that she and Petitioner had "some differences on trial strategy and how to approach the case." [<u>Id.</u> at 3]. She stated that Petitioner would not sign any of the probation paperwork and told her that she should not sit in with him when he met with probation because she was no longer his attorney." [<u>Id.</u> at 4]. Mills explained that Petitioner "waffled" about signing the stipulation, that she informed him prior to trial that she had not filed it, and that he told her to "[m]ake them work for it" by presenting expert testimony. [<u>Id.</u> at 14]. Mills explained that the case was mostly built on co-conspirator testimony, that Agent Murphy was not the person who interviewed most of those witnesses, and the flight information alibi evidence "wasn't something that went directly to most or any of the witnesses who testified." [<u>Id.</u> at 15]. Mills stated that she met with Petitioner extensively prior to trial and they agreed as to "what our case would look like." [<u>Id.</u> at 16]. She explained there was no credible basis to object to the chain of custody of the

21

Walmart video or the pictures of drugs. [Id. at 16-17]. She stated their theory of the case was that Petitioner was the "fall guy" in a group of people who were trying to gain advantage in their own cases. Moreover, although he admitted to having cocaine, the issue was whether he was responsible for methamphetamine or fentanyl. [Id. at 17-18]. Mills stated that Petitioner was refusing to cooperate with her or meet with her and would not let her be present during his interview with probation. [Id. at 18]. The magistrate judge allowed Mills to withdraw. [Id. at 23; 6/28/2019 Oral Order].

### D. Post-Trial Counsel and Petitioner's Motion for New Trial

On July 2, 2019, nearly three months after the jury verdict, the Court appointed Attorney Roderick Glenn Davis to represent Petitioner. [7/2/2019 Docket Entry]. Two weeks later, Petitioner filed a letter to Davis asking Davis about the status of the Rule 29 motion for judgment of acquittal filed by Mills and to file a Rule 33 motion for a new trial, stating that Federal Rule of Criminal Procedure 45(b) allowed a court to grant additional time to file such a motion if a defendant could show excusable neglect. [CR Doc. 70]. On August 1, 2019, Petitioner filed a letter to Davis memorializing a July 20, 2019 meeting with him, in which he asks Davis to move under Rule 45 for an extension of time to bring a Rule 33 motion for a new trial based on ineffective assistance of counsel. [CR Doc. 74]. On August 22, 2019, Petitioner moved to adopt Mills' renewed motion for judgment of acquittal. [CR Doc. 79]. On September 6, 2019, the Court granted the motion to adopt but denied the substantive motion. [CR Doc. 82]. The Court noted that in his own recorded statement Petitioner admitted to "purchasing multiple kilograms of methamphetamine from sources in Atlanta and distributing them through several people in Charlotte and surrounding areas." [Id. at 2]. The Court also noted that, "[s]ix people who distributed drugs, primarily methamphetamine, obtained from [Petitioner] testified about their

history of dealing with him and what they knew of his distributing through others." [Id.]. Furthermore, one of these witnesses was caught with just under a kilogram of 100% pure methamphetamine after meeting the Petitioner at a Walmart in the middle of the night, which was recorded on store security cameras. [Id.]. The Court concluded that "there was substantial evidence supporting [Petitioner's] guilt beyond a reasonable doubt on Counts One, Two, and Four." [Id. at 3].

On September 10, 2019, Petitioner filed three letters, two to Davis and the third to the undersigned. [CR Docs. 85-87]. In the first, Petitioner stated that he had not intended to file a Rule 33 motion asserting ineffective assistance during the 14-day period, but only later reached that decision once Davis was appointed and that he was not asserting that Mills was ineffective for failing to timely file a Rule 33 motion. [CR Doc. 85 at 1-2]. Petitioner asked Davis to file within the next ten days a motion for extension of time seeking "at least" two months to file the untimely Rule 33 motion. [Id. at 3]. In the second letter to Davis, Petitioner stated that he had sent a letter to Walmart regarding surveillance cameras in the parking lot, and he asked Davis to subpoena Walmart for "the information we discussed," which he identified as whether there were video surveillance cameras in the parking lot on June 9, 2017, whether the cameras were functioning properly, the file number for the video that was copied by the police, and how long Walmart keeps video footage before destroying it. [CR Doc. 86 at 2-3].

On September 13, 2019, just over two months after Davis' appointment, Petitioner filed a motion for inquiry of counsel. [CR Doc. 88]. He argued that Davis had not filed the motion for extension of time to file a Rule 33 motion, had not provided him with a copy of all the trial and hearing transcripts, and had not subpoenaed Walmart. [Id.]. The magistrate judge held an inquiry of counsel hearing on October 16, 2019. [CR Doc. 130; CV Doc. 1-1 at 149-81 (ex parte portion)].

23

Davis agreed that Petitioner had asked him to file a motion for a new trial asserting ineffective assistance of counsel and a motion to file such motion out-of-time. [CV Doc. 1-1 at 155-56]. Davis explained that making that showing was not easy, and he suggested to Petitioner that they go through the transcripts and Presentence Report and "go through everything you allege." [Id. at 156]. Davis was also reviewing the discovery and suggested waiting until the Court ruled on the motion for acquittal. [Id. at 157]. After the motion for acquittal was denied, Davis prepared a sample motion to extend time. [Id. at 158]. Davis recounted that approximately three weeks before he prepared the sample motion Petitioner had asked him to go to the Walmart on Independence Boulevard to see about a DVD. [Id.]. Davis went to the Walmart twice but was told "they had given all the information over to the police" and, though he left his business card, they did not call him back. [Id.]. Davis said that Petitioner requested new counsel shortly after he gave him the sample motion. [Id. at 158-59]. Davis explained to Petitioner that he thought it was "highly unlikely" that the motion for new trial would be granted and that he did not want to file a frivolous motion, but he would go through Petitioner's allegations if the motion for acquittal was denied. [Id. at 160, 168-69]. According to Davis, Petitioner was frustrated because "the motion is time sensitive," even though Davis reminded him that the time expired before Davis began representing him. [Id. at 160]. The magistrate judge, citing United States v. Mullen, 32 F.3d 891, 896-97 (4th Cir. 1994), noted that it was late in the proceedings, Petitioner had already been represented by "a number of different lawyers," that the inquiry related to certain motions Petitioner wanted filed on his behalf, and that Davis could still provide an adequate defense and would be able to continue discussing strategic decisions with Petitioner. [CR Doc. 130 at 5-7]. The Court allowed Petitioner and Davis to discuss Petitioner's request to proceed pro se and Petitioner ultimately decided to withdraw that request. [Id. at 8-10].

On November 29, 2019, Petitioner filed a motion for extension of time to file a motion for a new trial and a motion for a new trial. [CR Docs. 97, 98]. In the motion for more time, Davis referenced Petitioner's multiple requests to Davis to file a motion for a new trial. [CR Doc. 97]. Davis recounted that, "[o]n July 9, 2019, July 26, 2019, August 13, 2019 and August 29, 2019, the [Petitioner] wrote letters to defense counsel stating that he wanted defense counsel to file a motion for a new trial based on ineffective representation of prior counsel." [Id. at 2]. Davis explained that he had needed adequate time to fully review discovery and trial transcripts to give context to Petitioner's claims of ineffective assistance of trial counsel. [Id. at 2-4]. Davis argued he could show excusable neglect because prior counsel had failed to file a timely motion and Petitioner had requested that he do so within days of his appointment. [Id. at 4]. In his motion for new trial, Petitioner raised four claims of ineffective assistance. He argued that Mills had failed to: (1) investigate or adequately question witnesses regarding the June 9, 2017 drug transaction at Walmart; (2) move to dismiss Count Two based on the United States' alleged failure to investigate the existence of exculpatory evidence, "specifically the existence of a June 9, 2017, Walmart parking lot surveillance video;" (3) object to or move *in limine* to exclude the interior Walmart video; and (4) present "any exculpatory evidence" or "any defense alibi evidence" that had previously been discussed with Petitioner. [CR Doc. 98 at 3]. The Government moved to dismiss the motion as untimely and without merit, arguing that it was not based on newly discovered evidence and that Petitioner's raising ineffective assistance of counsel did not constitute excusable neglect. [CR Doc. 101].

On January 16, 2020, the Court denied Petitioner's motion for an extension of time to file the motion and dismissed the motion for new trial as time-barred, noting that Rule 33 motions based on ineffective assistance must be brought within the Rule's time limits. [CR Doc. 109 at 2-

3 (citing <u>United States v. Smith</u>, 62 F.3d 641, 648, 650-51 (4th Cir. 1995))]. The Court also held that Petitioner had failed to establish excusable neglect in any event:

> The defendant was aware of trial counsel's performance in early April 2019. Prior to that time, he had shown proficiency for informing the Court of his needs and dissatisfaction with prior counsel. Yet, he did not allege ineffective assistance of trial counsel until June 18, 2019, two months after the time period in Rule 33 expired. Although the defendant has not met the requirements to seek a new trial under Rule 33, he will have the opportunity to present his claim of ineffective assistance on direct appeal and, if necessary, on collateral attack under 28 U.S.C. § 2255.

[CR Doc. 109 at 3-4 (citations omitted)].

A few days before, Petitioner filed another motion for inquiry of counsel, stating he had to "part ways" with Davis. [CR Doc. 108]. On January 21, 2020, a magistrate judge held a hearing on Petitioner's motion. [CR Doc. 164; CV Doc. 1-2 at 8-33 (ex parte portion)]. Davis explained that he had worked with Petitioner to review the case and make sure he was not filing a frivolous motion, but Petitioner only wanted the motion written "his way." [CV Doc. 1-2 at 12-13]. Davis explained that Petitioner had other avenues of relief, including an appeal and a motion to vacate. [<u>Id.</u>]. Davis said that it required time to order and review the transcripts and review the "pages and pages and pages and pages" of documents and cases that Petitioner gave him to "get everything [Petitioner] wanted." [<u>Id.</u> at 18, 23-24]. Davis also explained that he had expressed his concerns to Petitioner about his revealing their confidential discussions to the Court. [<u>Id.</u> at 15-16, 20]. The magistrate judge noted that sentencing was in nine days and found that Petitioner had not met the <u>Mullen</u> standard for obtaining new counsel. [CR Doc. 164 at 33-34]. Petitioner then requested to proceed pro se, but after a <u>Faretta</u> hearing stated he would "keep Mr. Davis and let the chips fall where they may." [<u>Id.</u> at 34-41]. The magistrate judge determined that Davis should remain as counsel. [<u>Id.</u> at 41-42].

26

Six days later, Petitioner filed a pro se "Renewed Motion for a New Trial." [CR Doc. 112]. He asserted that he had told Davis at their first meeting on July 8, 2019, that he believed he had received ineffective assistance at trial and that he wanted to file a motion for a new trial. [Id. at 2]. Petitioner argued that the neglect "was that of prior counsel." [Id. at 7]. On January 30, 2020, the Court dismissed Petitioner's pro se renewed motion for a new trial because Local Criminal Rule 47.1(g) required that any motions be filed by counsel. [CR Doc. 114].

Petitioner was sentenced the same day. [CR Doc. 123]. Petitioner allocuted, maintaining his innocence. [Id. at 23-24]. The Court sentenced Petitioner to a term of imprisonment of 288 months, which included a three-level enhancement under U.S.S.G. § 3B1.1(b) for Petitioner's role in the offense. [CR Doc. 115 at 2: Judgment]. Judgment on Petitioner's conviction was entered on February 7, 2020. [Id.].

### E.    Petitioner's Appeal and Third Motion for New Trial

Petitioner appealed, arguing that this Court erred in denying his motion for an extension of time to file a motion for a new trial and that it erred in enhancing his sentence based on his managerial role in the offense.[3] United States v. Farris, 834 F. App'x 811, 812 (4th Cir.), cert. denied, 142 S.Ct. 373 (Oct. 12, 2021). The Fourth Circuit affirmed, noting that Petitioner "offered no excuse for the delay other than a threadbare assertion of excusable neglect" and "[g]iven that the 'critical' factor in the inquiry – the reason for [Petitioner's] delay – weighs against him," Petitioner did not establish that this Court abused its discretion "by concluding that he failed to establish his delay was excusable." Id. at 812-13 (citing United States v. Munoz, 605 F.3d 359, 372 (6th Cir. 2010)). The Fourth Circuit did not address this Court's conclusion that it was required to dismiss Petitioner's motions as time barred. See id.

---

[3] On appeal, Petitioner was represented by Michael W. Patrick. [CR Doc. 121].

On April 4, 2022, Petitioner filed a third motion for a new trial, asserting that the Government had failed to collect and preserve video surveillance and had not corrected Jones' "false trial testimony." [CR Doc. 165]. The Government opposed the motion, and the Court denied it and Petitioner's motion for reconsideration of that ruling. [CR Docs. 169, 170, 176, 181]. The Fourth Circuit affirmed the Court's denial of both the (third) motion for new trial and the motion for reconsideration. [CR Doc. 212].

### F. Petitioner's Motion to Vacate

Petitioner timely filed the instant motion to vacate on October 11, 2022. [CV Doc. 1; see id. at 58]. Petitioner asserts various claims of ineffective assistance of his trial counsel, Mills; his post-trial counsel, Davis; and his appellate counsel, Patrick. [Id. at 8-9, 31, 38]. He also claims prosecutorial misconduct and that this Court abused its discretion in denying his motion for an extension of time to file a motion for a new trial. [Id. at 46-47, 53]. More than two months later and after the limitations period expired, Petitioner sought leave to file a brief in support of his motion to vacate. [CV Docs. 4, 5, 5-1]. Then, on January 23, 2023, Petitioner filed a motion for leave to supplement his motion to vacate, seeking to add a claim of ineffectiveness based on his attorney's failure to move to dismiss his indictment based on pre-indictment delay. [CV Doc. 8 at 2-3]. In that motion, he contends that the Government gained "a tactical advantage" by the delay because Walmart's retention policy required that it destroy "the video" after six months. [Id. at 3].

This matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior

proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III. DISCUSSION

Petitioner asserts numerous claims of ineffective assistance of counsel at trial, post-trial, and on appeal. He also claims prosecutorial misconduct and again contends that this Court erred in denying his motion for extension of time to file a motion for new trial.

### A. Ineffective Assistance of Counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter, 562 U.S. 86, 88 (2011).

To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. It is not sufficient to show the mere "'possibility of

prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). In considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

Petitioner contends that he received ineffective assistance of counsel at all levels of his representation. [CV Doc. 1 at 8-9, 30, 38]. Many of Petitioner's claims flow from the alleged existence of an exculpatory video of the Walmart parking lot and his contention that GPS tracker data definitively established that Jones' car was over two miles away from the Walmart when she met Petitioner there. As a preliminary matter and as addressed more fully below, there has never been any evidence that an exculpatory video of the Walmart parking lot exists or existed, and, as decided relative to Petitioner's motion for a Franks hearing, whether GPS tracker data definitively showed Jones car in the Walmart parking lot at the relevant time is not material to whether Jones and Petitioner conducted a drug transaction in the parking lot at Petitioner's car. The evidence showed that Jones and Petitioner were in the Walmart store together, that Jones and Petitioner communicated several times that day to set up this transaction, and that Jones was found with a kilogram of methamphetamine shortly after the meeting. Moreover, by Petitioner's own trial testimony, the two exited the Walmart together and proceeded directly to Petitioner's car, where he claims that he tried to sell her a pound of marijuana. With this in mind, the Court turns to Petitioner's claims.

### 1. Trial Counsel

Petitioner claims Mills was ineffective for: (1) failing to investigate (a) the alleged Walmart transaction, including seeking the purported parking lot video; (b) Mays as an eyewitness to the drug transaction; and (c) the GPS tracker data report; (2) failing to raise a <u>Brady</u> violation based on the Government's failure to preserve exculpatory evidence, that is, the Walmart parking lot video; (3) failing to move to exclude video of only the interior of the Walmart; (4) failing to move to dismiss Count Two because there was no evidence to establish the prima facie elements of this offense; (5) failing to object to the Walmart video on Confrontation Clause grounds; (6) failing to call Agent Murphy to testify; (7) failing to object to the Government's examination of Talton and to adequately question witnesses, including impeaching the Government's witnesses with phone records; (8) failing to present exculpatory evidence, that is, the GPS tracker data report showing Jones' car was 2.4 miles away from the Walmart; (9) failing to object to Jones' perjured testimony that she went to retrieve $18,000.00 from her car at the Walmart; (10) failing to object to – and preserve for appellate review – the Government's closing remarks regarding the jury also being "a jury of the government's peers;" (11) failing to ask for a curative instruction after the Government "egregiously shifted the burden of proof;" (12) failing to move for a mistrial after the Government's closing statement; and (13) based on the cumulative errors rendering his trial fundamentally unfair.[4],[5]  [CV Doc. 1 at 8-29].

### a.     Walmart Parking Lot Video

---

[4] The Court will group and address Petitioner's claims in this matter as appropriate for ease of reading and to minimize repetition. The Court also notes that any claims not specifically addressed by the Court herein have been carefully reviewed and considered and the Court finds them to be without merit.

[5] In his motion to amend, Petitioner also argues that Mills was ineffective for failing to move to dismiss the indictment based on pre-indictment delay. [CV Doc. 8].  Petitioner seems to contend, without argument or explanation, that this claim relates back to his original motion to vacate.  [See <u>id.</u> at 2].

Petitioner argues that Mills failed to investigate whether there was any video from the Walmart parking lot, to raise a Brady claim because no such video was produced, or to move to dismiss Count Two of the indictment because any video from the parking lot was not preserved. Petitioner also belatedly argues that Mills was ineffective for not seeking an adverse inference jury instruction because the Government "negligently or deliberately lost or destroyed" any parking lot video. [See CV Doc. 5 at 4-5]. The Court addresses these contentions in turn.

To support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). If there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to investigate such a defense is not prejudicial. See Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996). Petitioner contends that Mills failed to investigate or "ascertain Wal-Mart procedures with security video when working with law enforcement." [CV Doc. 1 at 10; CV Doc. 5 at 4]. Petitioner, however, also alleges that "Wal-Mart's retention policy required it to destroy the video under its most favorable terms of six months." [CV Doc. 8 at 3; CR Doc. 165 at 5-6 & n.2 (alleging most Walmart stores keep parking lot videos for 30 days)]. Because Mills was not retained until June 27, 2018, more than a year after the Walmart transaction, Petitioner cannot show deficient performance or prejudice from her failure to obtain a video that he alleges was destroyed by that time. Moreover, he cannot show prejudice where he only speculates that any outside video would have been exculpatory. See United States v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations).

Second, Petitioner claims that Mills was ineffective for failing to raise a Brady claim relative to allegedly missing Walmart parking lot video. In Brady v. Maryland, the Supreme Court

held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). "For the purposes of Brady, a defendant must provide more than mere speculation regarding the existence of any exculpatory evidence to demonstrate the allegedly withheld information would be favorable to his defense." United States v. Fago-Maximo, 795 F. App'x 213, 215 (4th Cir. 2020) (citing United States v. Caro, 597 F.3d 608, 619 (4th Cir. 2010)). Petitioner has not shown that any video of the parking lot contained exculpatory evidence, much less evidence with a reasonable probability of changing the result at trial. See United States v. Terry, 366 F.3d 312, 316 (requiring concrete evidence of exculpatory information to establish prejudice). Rather, Talton testified that there were security cameras in the parking lot, that she would have "helped the officer to look through all the available surveillance that might be relevant for them in this particular case," and that the two video clips were the only ones she provided to law enforcement "that captured the individuals we see here," meaning Petitioner and Jones. [Tr. 391]. As such, Talton's testimony suggests that the two clips presented to the jury were the only video that TFO Elliott recorded.

Petitioner has presented only speculation that those cameras recorded any exculpatory evidence. Moreover, Petitioner has asserted conflicting contentions on this point. Petitioner baldly claims that investigation would have shown that TFO Elliott recorded Walmart parking lot video, [CV Doc. 5 at 4-5], which contradicts his previous claim that "TFO Elliott failed to copy any parking lot video footage to his cellular device," [CR Doc. 165 at 2], as well as his allegations that the Government failed to preserve parking lot video, [CV Doc. 1 at 14, 49]. Ultimately, Petitioner cannot show that Mills was deficient or that he was prejudiced by her failure to file a Brady motion

where the record evidence does not support that any camera footage captured Petitioner and Jones or that the Government had or suppressed any such evidence.

Third, in his motion to amend [CV Doc. 8], Petitioner claims that Mills was ineffective for not moving to dismiss Count Two based on pre-indictment delay. This claim is untimely and without merit. The one-year limitations period under 28 U.S.C. § 2255(f)(1) applies to supplemental claims raised after an original Section 2255 motion is filed. Farris v. United States, 333 F.3d 1211, 1215 (11th Cir. 2003). Under Rule 15(c) of the Federal Rules of Civil Procedure, supplemental claims that relate back to the claims in the original timely motion may be filed after the limitations period has expired. Id. A supplemental claim relates back if it arises from the same set of operative facts as the claims in the original motion. Id.; see Mayle v. Felix, 545 U.S. 644, 659 (2005) ("[R]elation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims."). "[T]o relate back, an untimely claims must have more in common with the timely filed claim than the mere fact that they arose out of the same trial or sentencing proceeding." Farris, 333 F.3d at 1215. "[N]ew claims alleging different trial errors [are] not part of the same course of conduct, and, as such, [do] not relate back to the date of the … timely filed § 2255 motion." Id. Here, Petitioner's motion to amend was not filed until over three months after the expiration of AEDPA's one-year statute of limitations. [See CV Docs. 8 at 7, 8-3]. While Petitioner again implicates the purported Walmart parking lot video in this claim, the claim itself does relate back to any claim asserted in Petitioner's original motion to vacate. As such, the Court will deny Petitioner's motion to amend his motion to vacate with this claim.

The claim lacks merit in any event. "[T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." United States v. Lovasco, 431 U.S. 783, 790 (1977). "[P]rosecutors are

34

under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." Id. at 791. "[N]o one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so" because it could cause potential sources of information "to evaporate before they are fully exploited" and use scarce resources on insubstantial cases or cases that include only some of the responsible parties or some of their crimes. Id. at 792-93.

To establish a due process violation based on a substantial pre-indictment delay, a defendant must establish actual prejudice. Howell v. Barker, 904 F.3d 889, 895 (4th Cir. 1990). A showing of "speculative prejudice" is insufficient. Jones v. Angelone, 94 F.3d 900, 907 (4th Cir. 1996). A defendant must show "that any actual prejudice was *substantial*—that he was meaningfully impaired in his ability to defend against the state's charges to such an extent that the disposition of the criminal proceedings was likely affected." Id. at 907. Only if the defendant can make that exacting showing, does a court balance prejudice to the defendant against the reasons for the delay and consider "whether the government's action in prosecuting after substantial delay violates fundamental conceptions of justice or the community's sense of fair play and decency.'" Howell, 904 F.2d at 895 (internal quotation marks omitted) (quoting United States v. Automated Med. Labs., 770 F.2d 399, 404 (4th Cir. 1985)).

Here, any delay in charging the Petitioner was not substantial. As shown by the trial evidence, the investigation of Petitioner's drug-trafficking activities involved numerous other defendants and records. Petitioner was not identified as the other participant in the Walmart transaction until June 20, 2017, when TFO Elliott sent a picture from Jones' meeting at the Walmart to Agent Murphy. [CV Doc. 1-2 at 133]. At that time, Petitioner was "actively being investigated by the ATF/FBI Violent Crimes Task Force in Charlotte." [Id.]. Jones was indicted

Case 3:22-cv-00557-RJC   Document 14   Filed 08/08/23   Page 35 of 58

in mid-October 2017 and pleaded guilty on February 23, 2018. [Criminal Case No. 5:17-cr-57, Docs. 1, 20]. Petitioner was charged less than two weeks later. As shown in Petitioner's March 8, 2018 interview, law enforcement was still investigating other people involved in trafficking methamphetamine, including sources of supply from Atlanta. Accordingly, any delay in charging the Petitioner was insubstantial and not unwarranted, see United States v. Stinson, 594 F.2d 982, 984 (4th Cir. 1979) (holding eight-month delay between last purchase of weapons from a defendant and his indictment was not lengthy), and Petitioner's speculative claim of prejudice is not enough, see Angelone, 94 F.3d at 907.

Finally, Petitioner's claim that Mills should have sought an adverse inference instruction relative to the "negligently or deliberately lost or destroyed" video is untimely. See 28 U.S.C. § 2255(f)(1); Clay v. United States, 537 U.S. 522, 532 (2003). Petitioner did not assert this claim until over two months after the mandatory limitations period expired. [See CV Doc. 5 at 41]. Because this claim does relate back to any claim asserted in Petitioner's original motion to vacate, it will be denied.[6] The claim also lacks merit. As addressed, Petitioner has presented no evidence that the Government ever had any video from the Walmart parking lot in the first instance and certainly no evidence that it lost or destroyed such evidence. See United States v. Johnson, 996 F.3d 200, 206 (4th Cir. 2021) (recognizing that to obtain an adverse inference instruction there must be a showing that willful conduct resulted in the loss or destruction of evidence a party knew was relevant to a trial issue). As such, no instruction would have been given even if Mills had requested it.

    b.    **Walmart Interior Video**

---

[6] As such, the Court will deny Petitioner's Motion for Leave to File Petitioner's Memorandum [CV Doc. 5-1] to the extent the Memorandum asserts this new, untimely claim. The Court, however, will grant Petitioner's Motion for Leave to File Oversize Brief [CV Doc. 4] and has reviewed and considered Petitioner's Memorandum to the extent it explains and clarifies Petitioner's original arguments and claims.

36

Petitioner contends that Mills should have filed a motion *in limine* to exclude the video from inside the Walmart under Federal Rule of Evidence 106, the "Rule of Completeness." [CV Doc. 1 at 15-16]. Petitioner intimates that, without the parking lot video, the evidence was incomplete. [See id.]. Petitioner also asserts that Mills should have objected to the introduction of the interior video at trial under Federal Rule of Evidence 403 because its probative value was outweighed by the danger of unfair prejudice, and under the Confrontation Clause because TFO Elliott, who had recorded the video, did not testify, and on the ground that it was not the original recording. [Id. at 16-18; CV Doc. 5 at 12-14].

Petitioner has again failed to show deficient performance or prejudice. Rule 106 allows an adverse party to require the introduction of any other part of a writing or statement that the other party introduces if it "in fairness ought to be considered at the same time." Fed. R. Evid. 106. "[I]ts purpose is to prevent a party from misleading the jury by allowing into the record relevant portions of the excluded testimony which clarify or explain the part already received." United States v. Wilkerson, 84 F.3d 692, 696 (4th Cir. 1996). Evidence that Petitioner met Jones at the Walmart where she said she was going to wait was relevant and not overly prejudicial. Petitioner fails to explain how any video from the parking lot was necessary to complete the story that the two met at Walmart, especially where Petitioner himself testified that the two left the Walmart together and proceeded directly to his car. Moreover, there was no grounds under the Confrontation Clause to object to TFO Elliott not testifying at trial; the video was not his testimony. Talton, who was present when the recording was made, testified that it was the same video she helped officers collect in June 2017. As such, Petitioner has not shown ineffective assistance of counsel for failing to make meritless objections. See United States v. Anthony, 149

37

F. App'x 135, at *1 (4th Cir. 2005) (holding attorney was not ineffective for failing to raise a meritless objection).

### c.    Joseph Mays

Petitioner claims that Mills was ineffective for failing to interview Mays and that he was prejudiced thereby because he had a Sixth Amendment right to confront any eyewitnesses at trial. [CV Doc. 11-12; see CV Doc. 5 at 5-7]. Petitioner argues that it was incumbent on counsel "to find out if Mays had any information as to the guilt or innocence of her client." [CV Doc. 5 at 7]. Even if Petitioner could show that Mills did not attempt to interview Mays and that this was deficient, he cannot show prejudice. Petitioner has not shown that Mays was available, would have testified, and would have provided exculpatory testimony. See Beaver, 93 F.3d at 1195 ("[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced."); Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990) (dismissing claims of ineffective assistance of counsel where petitioner failed to make a specific proffer of the testimony of the omitted witness). Petitioner asserts only that, "[i]f the jury had heard and learned from Mays as to what he witnessed on June 9, 2017, the outcome of the trial would reasonably have been different." [CV Doc. 1 at 12]. This allegation is too speculative and conclusory to warrant relief. See Dyess, 730 F.3d at 359-60.

Next, the Sixth Amendment is not violated by the failure to call an eyewitness at trial. The Confrontation Clause "applies to 'witnesses' against the accused," those who provide testimony against him. Crawford v . Washington, 541 U.S. 36, 51, 124 S.Ct. 1354 (2004). It protects against the admission of testimonial hearsay at trial where the witness is not present, unless the witness is unavailable, and the defendant had a prior opportunity to cross-examine the witness. Id. at 59. As noted, Mays did not testify at trial.

#### d.     GPS Tracker Data and Agent Murphy

Petitioner contends that Mills was ineffective for failing to admit the GPS tracker information, claiming it would have shown that Jones was lying because her car was never in the Walmart parking lot.  [CV Doc. 1 at 13, 22-24].  Petitioner argues that Mills should have called Agent Murphy as a witness for the same reason.[7]  [Id. at 19].  Petitioner has failed to show deficient performance or prejudice.  Regardless of what the GPS tracker data showed, Petitioner and Jones testified that they were both at the Walmart and the store video corroborated this testimony.  Petitioner's contention that the GPS tracker report would have shown that Jones committed perjury because she said that she retrieved $18,000.00 from her car, but her car was over two miles away, completely distorts the record evidence.  Jones never testified that she retrieved $18,000.00 from her car before paying Petitioner for methamphetamine he had fronted her.  Rather, when asked what happened when she and Petitioner left the Walmart, Jones answered, "We went into our cars. I gave him, like, I think it was $18,000.00 and he fronted me a kilo of meth."  [CR Doc. 91 at 171]. Jones testified that she went to Petitioner's car for the exchange.  On this point, Petitioner testified that "we walked out together to my car to the parking lot" and "[w]e went to my car so she could look at the product."  [CR Doc. 92 at 49].  He specifically testified that he did not go to Jones' car. [Id. at 50]. Accordingly, even if the GPS tracker information could have been used to impeach Jones' testimony that her car was in the parking lot, it fell within the wide range of reasonable professional assistance not to seek to admit that evidence where it was undisputed that Jones and Farris met at the Walmart for a drug transaction.  See Strickland, 466 U.S. at 689.

Petitioner has also failed to show ineffective assistance of Mills for failing to call Agent Murphy to testify at trial to impeach him with the GPS tracker information.  "[T]he decision

---

[7] Petitioner's claim that he had a Sixth Amendment right to confront Murphy based on Murphy's affidavit is unfounded.  Agent Murphy's affidavit was not admitted at trial.

whether to call a defense witness is a strategic decision" involving the balance of potential benefits and risk and is entitled to "enormous deference." Terry, 366 F.3d at 317 (internal quotations and citation omitted). Petitioner has not shown that Agent Murphy would have provided information helpful to the defense or that it would have made sense to try to impeach him for the contents of an affidavit that was not introduced at trial. Moreover, calling Murphy to testify regarding the GPS tracker information would have opened the door to the Government explaining any limitations of the tracking information. Also, Murphy's affidavit stated that the GPS information indicated that Jones' car traveled to Charlotte, North Carolina, arriving around 11:10 p.m. and that Jones' statement that she met Petitioner at the Walmart on East Independence Boulevard in Charlotte "was corroborated by a review of the GPS tracker." [CR Doc. 1 at 5]. This was consistent with the GPS tracker information provided by Killian and the GPS data. [CV Doc. 1-2 at 130; see CR Doc. 169-2].

### e. Witness Testimony

Petitioner makes several contentions related to Mills' examination of witnesses at trial. None of these claims have merit. Petitioner asserts that Mills should have objected to Jones' testimony that she went to her car in the Walmart parking lot to retrieve money to pay Petitioner. [CV Doc. 1 at 22-23]. As already noted, Jones did not testify that she retrieved money from her car to pay Petitioner. [CR Doc. 91 at 171]. And, again, it was undisputed that Petitioner and Jones met at the Walmart, exited the Walmart store together, and at least attempted to engage in a drug transaction together at Petitioner's car. Accordingly, it was well within the wide range of reasonable professional assistance not to challenge the location of Jones' car.

Petitioner also argues that Mills should have objected to the Government asking Talton whether she would have helped the officer look through surveillance that might be relevant in a

particular case because it called for speculation. [CV Doc. 1 at 20]. Federal Rule of Evidence 406 allows evidence of "a person's habit or an organization's routine practice" to be admitted "to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." Fed. R. Evid. 406. Petitioner has not shown that Mills was deficient in not challenging Talton's testimony or that he was prejudiced thereby, especially where objecting would have allowed the prosecution to reinforce Talton's testimony.

Next, Petitioner claims that Mills failed "to adequately question witnesses during cross examination." [CV Doc. 1 at 20]. Petitioner asserts that "[w]itness after witness testified to calling or texting Petitioner to arrange to buy drugs," but Mills never tried to impeach them with his phone records, which Mills had access to through a pen register warrant.[8] [Id. at 21]. Petitioner's only directed allegation on this issue is that "Conboy testified with specificity as to allegedly placing calls in early November 2016 to purchase drugs." [Id.]. While Conboy did testify that she would call Petitioner in 2016 to purchase heroin and methamphetamine, she also testified that Petitioner had multiple phone numbers that she used to call him during this time. Moreover, the evidence at trial showed that Petitioner used a number of different phones and phone numbers and Conboy was only one of many witnesses against him. Additionally, the jury heard a recorded Jail call in which Conboy called Petitioner for help in making bail, reflecting that the two were at least on terms consistent with communication by phone call, whether or not drugs were a topic of conversation. As such, Petitioner has failed to show deficient performance or prejudice on this conclusory claim.

Finally, Petitioner contends that Mills should have used evidence from the Government's search of his cell phones in cross examining Jamar Miller. [CV Doc. 1 at 21]. Petitioner complains

---

[8] Petitioner acknowledges that Mills sought funds for and hired a telecommunications expert in aid of his defense. [See CV Doc. 1-1 at 119].

that Mills should have questioned Miller about messages Miller says he sent on May 3, 2017 – the day he was arrested, because they would have shown Petitioner was not involved in the transaction. [Id.]. Petitioner, however, ignores that he admitted during his interview that he often changed phone numbers, and Miller testified that Petitioner regularly switched out phones, including on May 3, 2017. [CR Doc. 92 at 21-22]. As such, Petitioner has not shown that there is a reasonable probability that, had Mills used phone records to question Miller about May 3, 2017 text messages, that the outcome of the proceeding would have been different.

### f. Government's Closing Argument

Petitioner contends that Mills should have objected to the Government's closing remark to the jury that, "You're also a jury of the government's peers," and sought a curative instruction and a mistrial. [CV Doc. 25-29]. Petitioner argues that this remark shifted the burden of proof by telling the jury to "assume the role of the government." [Id. at 25].

Counsel is given "wide latitude" in making closing arguments. Oken v. Corcoran, 220 F.3d 257, 269-70 (4th Cir. 2000) (internal citation and quotation omitted). Counsel is not ineffective for failing to object to a proper argument or for failing to raise every nonfrivolous objection. See Knowles v. Mirzayance, 556 U.S. 111, 126-27, 129 S.Ct. 1411 (2009). Moreover, "[f]ailing to object is often a tactical and wise decision made to avoid calling special attention to the remarks." Beal v. Setzer, 865 F.2d 1256, at *2 (4th Cir. 1989) (table decision).

Here, as noted, the Government stated in closing: "As [Petitioner] said on the stand, 'a jury of his peers.' You know what, you're also a jury of the government's peers. We expect 12 folks to listen to the evidence and make an impartial decision on this case." [CR Doc. 92 at 123]. The Government was responding to Petitioner's testimony, reminding them of their duty of impartiality when reaching a verdict. Asking jurors to make an impartial decision did not deprive Petitioner

of an impartial jury or due process.  See Oken, 220 F.3d at 269-70; Washington v. United States, 291 F.Supp.2d 418, 440 (W.D. Va. 2003) (holding it was not improper for prosecutors to ask jurors "to act as the 'conscience of the community' as long as the comments are not intended to inflame the passions of the jury").  Accordingly, Petitioner has not shown deficient performance for Mills' failure to object to the Government's closing argument, to seek a curative instruction, or to ask for a mistrial; or any prejudice suffered thereby.

### g.      Cumulative Error

Petitioner argues that Mills' purported errors rendered his trial fundamentally unfair.  [CV Doc. 1 at 29].  This claim also fails.  Claims of ineffective assistance are not subject to cumulative error review.  Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998) (claims of ineffective assistance of counsel must be evaluated individually, not cumulatively).

In sum, because Petitioner has not shown deficient performance or prejudice, his claims of ineffective assistance of counsel by Mills will be denied.

### 2.      Post-Trial Counsel

Petitioner asserts that Davis provided ineffective assistance of counsel after trial for failing to timely file a new trial motion and for failing to move to reconsider the denial of Petitioner's motion for extension of time to file a new trial motion.  Petitioner also contends that Davis was ineffective for laboring under a conflict of interest and failing to move to withdraw based on a conflict of interest.  [CV Doc. 1 at 30-36].  Petitioner has failed to show deficient performance or prejudice on these issues.

"Federal Rule of Criminal Procedure 33 provides that a trial court may, on a defendant's motion, grant a new trial 'if the interest of justice so requires.'" United States v. Sprouse, 517 F. App'x 199, 204 (4th Cir. 2013).  The Fourth Circuit has "observed that 'a court should exercise its

discretion to grant a new trial sparingly, and that it should do so only when the evidence weighs heavily against the verdict.'" Id. (quoting United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003)). A motion for new trial based on any ground other than newly discovered evidence must be brought within 14 days after the jury verdict. Fed. R. Crim. P. 33(b)(2). However,

> under Rule 45(b)(1)(B), if for some reason the defendant fails to file the underlying motion for new trial within the specified time, the court may nonetheless consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect.

Fed. R. Crim. P. 33, Advisory Committee Notes (2005 Amendment). Rule 45 states, in pertinent part, that "the court … for good cause … on a party's motion" may extend the time "after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B).

Petitioner claims that Davis was ineffective for failing to timely file a Rule 33 motion for new trial. This claim is without merit. The time to file a new trial motion, however, expired well before Davis was appointed to represent Petitioner. Moreover, Petitioner told Davis that he had not intended to file a new trial motion during the 14-day window and only reached that decision once Davis was appointed to represent him. [CR Doc. 85 at 1-2]. He also told Davis that he was not asserting that Mills was ineffective for failing to file the motion within 14 days. [Id.]. Davis filed the motion for new trial and motion for extension of time to file it after having obtained and reviewed the substantial record, as well as "pages and pages and pages and pages" of documents and cases Petitioner gave him. [See CV Doc. 1-2 at 12-13, 18, 23-24]. Also, Davis's decision not to move to reconsider the Court's denial of the motion for extension of time and motion for new trial were well within the wide range of reasonable professional assistance. Such motions are rarely granted and only in very limited circumstances that Petitioner has not shown. [See CV Doc. 1 at 35-36].

Petitioner also claims that Davis created a conflict of interest by deciding to wait until the Court's decision on the Rule 29 motion before moving for an extension of time to file a Rule 33 motion (and filing such motion) and was ineffective for failing to move to withdraw based on such conflict. [CV Doc. 33-35].

To establish ineffective assistance arising from a conflict of interest, a "petitioner must show (1) that his lawyer was under 'an actual conflict of interest' and (2) that this conflict 'adversely affected his lawyer's performance.'" United States v. Nicholson, 475 F.3d 241, 249 (4th Cir. 2007) (quoting Cyler v. Sullivan, 446 U.S. 335, 348 (1980)). "An actual conflict of interest arises 'when a defense attorney places himself in a situation inherently conducive to divided loyalties … If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists.'" Whelchel v. Bazzle, 489 F.Supp.2d 523, 535 (D.S.C. Dec. 18, 2006) (quoting Duncan v. State, 315 S.E.2d 809, 811 (S.C. 1984)).

It is insufficient to show the mere possibility of a conflict, rather "[t]o establish an actual conflict of interest, [Petitioner] 'must show that [his] interests diverged with respect to a material factual or legal issue or to a course of action" and that his attorney "actively represented conflicting interests." Id. (quoting Gilbert v. Moore, 134 F.3d 642, 652 (4th Cir. 1998) (en banc). To show adverse effect, Petitioner must show three things: (1) there was a "plausible alternative defense strategy or tactic" that counsel could have pursued; (2) "the alternative strategy or tactic was objectively reasonable" based on the facts of the case known by the attorney when the tactical decision was made; and (3) "counsel's failure to pursue that strategy or tactic was linked to the actual conflict." Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir. 2001) (en banc). Petitioner has not met these standards.

That Davis did not bend to Petitioner's whim and insisted on reviewing the record to determine whether Petitioner had any plausible basis for his ineffective assistance of trial counsel claims is not a conflict of interest or ineffective assistance of counsel. This is particularly true where direct appeal and relief under Section 2255 for ineffective assistance remained available to Petitioner. Moreover, Petitioner's allegation that Davis did not inform the Court why the motion was "late" is simply untrue. Rather, Davis clearly told the Court, both in his motion for extension of time and in the inquiry of status hearings, that Petitioner repeatedly and consistently requested that Davis promptly file a motion for extension of time to file the Rule 33 motion.

In sum, Petitioner has not shown deficient performance or prejudice on these issues and his claims of ineffective assistance of counsel by Davis will be denied.

### 3. Appellate Counsel

On appeal, Petitioner's appellate counsel, Michael W. Patrick, argued that this Court erred in denying Petitioner's motion to extend time to move for a new trial without an evidentiary hearing and in enhancing Petitioner's sentence based on his role in the offense. [CV Doc. 1-2 at 46-75]. Petitioner contends that Patrick provided ineffective assistance on appeal for: (1) failing to file transcripts of status-of-counsel hearing, which resulted in an incomplete record for appellate review; (2) failing to argue that Petitioner was denied counsel at the critical Rule 33 stage because Davis was operating under a conflict of interest; (3) failing to argue that the District Court abused its discretion when it forced Davis to labor under a conflict of interest; (4) failing to argue a Brady claim; (5) failing to argue prosecutorial misconduct; and (6) failing to withdraw as appellate counsel. [CV Doc. 1 at 38-45].

Courts should ordinarily find ineffective assistance of counsel for failure to raise claims on appeal only when "ignored issues are clearly stronger than those presented." Smith v. Robbins,

528 U.S. 259, 288 (2000) (internal citation and quotation omitted). Appellate counsel is not required to assert all non-frivolous issues on appeal. Griffin v. Aiken, 775 F.2d 1226, 1235 (4th Cir. 1985). Rather, "it is the hallmark of effective appellate advocacy" to winnow out weaker arguments and to focus on more promising issues. Smith v. Murray, 477 U.S. 527, 536 (1986). Thus, "[a] decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993). Additionally, the petitioner still bears the burden of showing that there is a reasonable probability that but for counsel's failure to raise an issue on appeal, the result of the proceeding would have been different, i.e., that he would have prevailed on appeal. See Robbins, 528 U.S. at 285-86.

### a.        Inquiry of Counsel Transcripts

Petitioner asserts that Patrick was ineffective on appeal because he did not order or file transcripts from the three inquiry of counsel hearings to support the argument that this Court abused its discretion when it denied the motion for extension of time to file a motion for a new trial without an evidentiary hearing. [CV Doc. 1 at 39-40]. Petitioner asserts that "Patrick raised an issue on direct appeal without knowing what happened in the district court proceedings." [CV Doc. 1 at 41].

Regardless of whether Patrick should have ordered and reviewed these transcripts, Petitioner has not shown prejudice relative to this claim. He asserts only – in summary fashion – that "[h]ad Mr. Patrick performed as counsel should have the outcome of the direct appeal would have been different." [CV Doc. 1 at 41; see id. at 42-43]. He does not show how the inquiry of counsel transcripts would have made any difference in the outcome of his appeal. If anything, the transcripts would have further supported that no evidentiary hearing was necessary because Petitioner and Davis thoroughly explained theirs positions on the motion for extension of time and

47

Rule 33 motion during those proceedings. Moreover, if the Court had granted the extension of time to file a new trial motion, any claims of ineffective assistance of counsel against Mills would have been unfounded in any event, as shown above.

**b.**      **Denial of Counsel at Rule 33 Stage Due to Conflict of Interest**

Petitioner argues that Patrick was ineffective for failing to argue that, because Davis was operating under a conflict of interest in deciding to delay filing the new trial motion, Petitioner was denied counsel at a "critical stage." [CV Doc. 1 at 40-42]. Petitioner reasons that because "[t]he filing of an untimely new trial motion requires the showing of 'excusable neglect,'" Davis was required to "inform the district court why the motion was late." [Id. at 40]. Petitioner asserts that Patrick "should have raised the clearly stronger argument" that Petitioner was deprived of conflict-free counsel relative to his Rule 33 motion. [Id. at 42]. As addressed, supra, Davis did not operate under a conflict of interest and Petitioner's claim that Davis did not inform the Court why the motions were untimely is false. Patrick was not ineffective for declining to raise this unsupported argument and Petitioner has failed to show prejudice in any event.

**c.**      **Prosecutorial Misconduct**

Petitioner also contends that Patrick was ineffective for failing to raise a Brady claim, failing to assert that the Government knowingly presented perjured testimony, and failing to argue the Government denied Petitioner's Sixth Amendment rights through its closing argument. [CV Doc. 1 at 43-45]. As to these arguments, Petitioner falsely claims that this Court's "record reflected that Wal-Mart turned over the Wal-Mart parking lot video to the government on June 14, 2017." [Id. at 43]. As already addressed, supra, and as addressed infra, these underlying claims lack merit in the first instance and Patrick was certainly not ineffective for failing to raise

unsupported appellate arguments. Moreover, Petitioner failed to show prejudice in any event. [See id. at 44-45].

### d. Self-Representation

Petitioner claims that he received ineffective assistance because Patrick refused to file a petition for rehearing en banc after the Fourth Circuit affirmed this Court's judgment on appeal. [CV Doc. 1 at 52-53]. This claim lacks merit. Petitioner is not constitutionally entitled to representation to bring a discretionary motion. See Pennsylvania v. Finley, 481 U.S. 551, 55 (1987) (holding "the right to appointed counsel extends to the first appeal of right, and no further"). In any event, Petitioner filed a pro se request for rehearing en banc, which the Fourth Circuit denied. Farris, No. 21-4142, ECF Nos. 50 & 58.

As such, because Petitioner has not shown deficient performance and prejudice, his claims of ineffective assistance of counsel on appeal will also be denied.

### B. Prosecutorial Misconduct

Petitioner asserts three claims of prosecutorial misconduct: (1) the Government violated Brady and Trombetta by not charging Petitioner until nine months after the Walmart transaction, thereby impairing his ability "to gather critical exculpatory information for his defense from Wal-Mart;" (2) the Government violated Giglio and Napue by allowing perjured testimony by Jones and Killian to go unchecked; and (3) the Government's closing statement nullified the jury, denying Petitioner's right to a fair trial and violating his due process rights. [CV Doc. 1 at 48-52 (quote at 48)].

### 1. Procedural Default

A § 2255 motion is not a substitute for a direct appeal. See Bousley, 523 U.S. at 621-22; Sunal v. Large, 332 U.S. 174, 178-79, 67 S. Ct. 1588 (1947). Claims of error that could have been

49

raised on direct appeal, but were not, are procedurally barred unless the petitioner shows both cause for the default and actual prejudice or demonstrates that he is actually innocent of the offense. Bousley, 523 U.S. at 621-22; United States v. Bowman, 267 F. App'x 296, 299 (4th Cir. 2008). "[C]ause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999).

To show actual prejudice, a petitioner must demonstrate that errors in the proceedings "worked to his *actual* and substantial disadvantage" and were of constitutional dimension. See United States v. Frady, 456 U.S. 152, 170 (1982). To show actual innocence, a petitioner must demonstrate that he "has been incarcerated for a crime he did not commit." United States v. Jones, 758 F.3d 579, 584 (4th Cir. 2014). Actual innocence is based on factual innocence and "is not satisfied by a showing that a petitioner is legally, but not factually, innocent." See Mikalajunas, 186 F.3d at 494.

Petitioner has procedurally defaulted his claims of prosecutorial misconduct because he did not raise any claim of prosecutorial misconduct at trial or on direct appeal. Furthermore, Petitioner has not overcome his procedural default. That is, because his claims of ineffective assistance on these issues lack merit, he has not shown cause to overcome his procedural default. He has also failed to show prejudice, where he has not shown prosecutorial misconduct in the first instance and, therefore, that any alleged misconduct worked to his actual and substantial disadvantage. Finally, Petitioner has failed to show actual, factual innocence of the charges. See Weeks v. Bowersox, 119 F.3d 1342, 1352-53 (8th Cir. 1997) (holding mere allegations that exculpatory evidence exists is insufficient to support a claim of actual innocence). These claims,

therefore, will be dismissed. Moreover, Petitioner's claims of prosecutorial misconduct fail on the merits in any event.

### 2. Merits

To establish prosecutorial misconduct, a defendant must demonstrate: (1) that the conduct of the prosecutor was improper, and (2) that the improper conduct prejudicially affected his substantial rights so as to deprive him of a fair trial. See United State v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993).

### a. Brady and Trombetta

As noted, in Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. "Therefore, a Brady violation contains three elements: the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." Nicolas v. Attorney Gen. of Md., 820 F.3d 124, 129 (4th Cir. 2016). Evidence is "material" if there is a "reasonable probability that [its] disclosure would have produced a different outcome." United States v. Stokes, 261 F.3d 496, 502 (4th Cir. 2001) (citation omitted). "Both information that undermines the prosecution's case and information that supports the defendant's case constitute Brady material that must be disclosed." Nicolas, 820 at 129.

Under California v. Trombetta, "[w]hatever duty the Constitution imposes" to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. 479, 488 (1984). Thus, "the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489.

The failure to preserve "'potentially useful evidence' does not violate due process '*unless a criminal defendant can show bad faith on the part of the police*.'" <u>Illinois v. Fisher</u>, 540 U.S. 544, 547-48 (2004) (quoting <u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988)) (emphasis added). To establish bad faith, an officer must have "intentionally withheld the evidence for the purpose of depriving the [defendant] the use of that evidence during his criminal trial." <u>United States v. Fridie</u>, 442 F. App'x 839, 842 (4th Cir. 2011) (quoting <u>Jean v. Collins</u>, 221 F.3d 656, 663 (4th Cir. 2000)).

Here, Petitioner claims that the Government violated <u>Brady</u> and <u>Trombetta</u> by "failing to preserve the Wal-Mart parking lot video because of the exculpatory nature of the evidence." [CV Doc. 1 at 49; <u>see</u> CV Doc. 5 at 30-36]. Petitioner, however, has not shown that the Government possessed any video from the Walmart parking lot, that any such video was exculpatory, or that the Government destroyed any such video. Specifically, Petitioner has presented no evidence that video from the Walmart parking lot showed Jones' car, his car, or any interaction between the two in the parking lot. The evidence at trial suggests, at best, that there were some cameras in the parking lot. There was no testimony regarding where those cameras were located, how well they captured images in the dark, whether they were directed at the areas where Jones and Petitioner were parked, or whether any trees or other obstructions may have blocked the view. Moreover, Petitioner himself testified that he and Jones went to his car together for her to purchase a pound of marijuana from him. There is simply no evidence suggesting that a camera captured that exchange with Jones walking away from Petitioner's car empty-handed as Petitioner claims. As such, Petitioner has failed to show that any video from the Walmart parking lot "possessed an exculpatory value that was apparent before the evidence was destroyed." <u>See</u> <u>Trombetta</u>, 467 U.S. at 489; <u>Youngblood</u>, 488 U.S. at 58. Moreover, to the extent that video footage of the parking lot

transaction was captured by Walmart's cameras, Walmart, not the Government, would have "destroyed" it pursuant to its own retention policies. See United States v. Naranjo, 634 F.3d 1198, 1212 (11th Cir. 2011) ("Brady applies only to information possessed by the prosecutor or anyone over whom he has authority.").

Petitioner has also failed to show bad faith. When TFO Elliott met with Talton, he was investigating Jones and attempting to identify "G," the person she said sold her methamphetamine. Petitioner asserts in his supplemental brief that the evidence suggests that TFO Elliott acted in bad faith with respect to any parking lot video because he reported that GPS tracker data confirmed that Jones' car was at the Walmart from approximately 10:30 p.m. until midnight. [CV Doc. 5 at 34 (citing CV Doc. 1-2 at 20)]. Petitioner, however, has not shown that this statement by Elliott evinces bad faith relative to any parking lot video. Petitioner also fails to show that Elliott ever viewed or possessed a Walmart parking lot video or that he failed to follow procedure relative thereto. Rather, the evidence shows that Elliott used his cell phone to capture the relevant video showing the then unidentified Petitioner and Jones together.

In sum, even if the claim were not barred, Petitioner has not shown that the Government violated Brady or Trombetta relative to the any parking lot video. This claim would also be dismissed on the merits.

### b.    Giglio and Napue

In Giglio, the Supreme Court held that "[i]mpeachment evidence, as well exculpatory evidence, falls within the Brady rule." United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985) (citing Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972)). "Such evidence is evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." Id. (internal quotations and citations

omitted).  Under <u>Napue v. Illinois</u>, 360 U.S. 264, 79 S.Ct. 1173 (1959), "the government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction or allow it to go uncorrected when it appears.  False testimony includes both perjury and evidence that, though not itself factually inaccurate, creates a false impression of facts which are known not to be true." <u>Juniper v. Davis</u>, --- F.4th ---, 2023 WL 4610068, at *7 (4th Cir. Jul. 19, 2023) (quoting <u>Burr v. Jackson</u>, 19 F.4th 395, 410 (4th Cir. 2021) (alterations adopted) (citations and internal quotation marks omitted), <u>cert. denied</u>, --- U.S. ---, 143 S.Ct. 151 (2022)). A <u>Napue</u> claim, therefore, requires a showing of the (1) falsity and (2) materiality of testimony and (3) the prosecutor's knowledge of its falsity.  <u>Basden v. Lee</u>, 290 F.3d 602, 614 (4th Cir. 2002).

Petitioner here claims that the Government "used perjured testimony to obtain the conviction" because it "was aware that Jones' vehicle never pinged or arrived at Wal-Mart."  [CV Doc. 1 at 50].  Petitioner asserts that Killian "testified that he saw everywhere Jones' vehicle went on the night of June 9, 2017" and Jones testified "about going to her car and where her car was parked in the Wal-Mart parking lot."  [<u>Id.</u>].  Petitioner states that the evidence showed that Jones' vehicle was 2.4 miles away from the Walmart parking lot and the Government knew this and did not correct Killian's or Jones' testimony.  [<u>Id.</u>].  Petitioner's <u>Giglio</u>/<u>Napue</u> claim is without merit.

There is no dispute that Petitioner and Jones were at the Walmart in the late hours of June 9, 2017.  Petitioner admitted meeting Jones there and store video showed Jones and Petitioner there together. Petitioner also admitted leaving the store with Jones and going to directly to his car with her.  Petitioner never testified that Jones went to her car before going to his.  Regardless of whether the GPS tracker data pinged Jones car at the Walmart, her physical presence at the Walmart with Mays, as corroborated by other substantial evidence, supports her testimony that she drove to that location.  Moreover, Officer Killian testified only that the GPS tracker allowed for

real-time tracking. [CR Doc. 91 at 98-99]. He did not testify that "he saw everywhere Jones' vehicle went on the night of June 9, 2017," as claimed by Petitioner.

Moreover, analysis of the GPS tracker data report generally corroborates the night's timeline while also suggesting that the report failed to capture some of the vehicle's movements unrelated to the Walmart transaction. At 9:12 p.m., the tracker reported a general location of "1022-1074 Clarks Creek Circle" in Newton, North Carolina. [CR Doc. 169-2]. At 11:46 p.m., Petitioner and Jones exited the Walmart. [CR Doc. 63, Gov-20]. At 11:59 p.m., the tracker reported that Jones' car was located near 6136 Andrew Jackson Highway, Charlotte, which is roughly 2.4 miles from the Walmart. [CR Doc. 169-2]. The tracker report does not show Jones' vehicle pinging at the Walmart – or anywhere else – between 9:12 p.m. and 11:46 p.m. Rather, it shows that Jones traveled only 47 miles during over 2 hours and 46 minutes, averaging less than 17 miles per hour during this time segment. This makes little sense and certainly suggests that the report is missing a stop or more, especially where Jones testified to having been there long enough to shop for paint. To be sure, looking to the very next entry in the report, it shows that, beginning at 12:01 a.m., Jones' vehicle traveled from "2429-2499 Village Lake Drive" in Charlotte to "4100-4198 Brookshire Boulevard," but it fails to show Jones arriving at the Village Lake Drive address in the first place. [See CR Doc. 169-2 at 2, 4].

In any event, about 20 minutes later, Petitioner called Jones and, about 20 minutes after that, Jones texted Petitioner to say she was going to "jacc in the box." [CR Doc. 169-4]. About 15 minutes later, the GPS tracker report showed that Jones' vehicle was located near 216 North Hoskins Road, Charlotte. [CR Doc. 169-2 at 4]. A Jack in the Box restaurant is located at 220 N. Hoskins Road, Charlotte. [CV Doc. 10 at 59]. As such, the GPS data generally supports the testimony of Jones and Killian, and Petitioner has not shown that the Government knowingly used

false testimony to obtain his conviction. See Burr v. Jackson, 19 F.4th 395, 410, 415 (4th Cir. 2021) (holding mere inconsistencies do not establish the knowing use of false testimony), cert. denied, 143 S.Ct. 151 (2022).

### 3. Government's Closing Argument

Petitioner argues that the Government's closing argument "nullified" the jury and denied him a fair trial. [CV Doc. 1 at 51-52]. Petitioner's claim is unfounded. As held, supra, asking a jury to make an impartial decision did not deprive Petitioner of an impartial jury or due process. See Oken, 220 F.3d at 269-70.

### C. District Court Error

Finally, Petitioner argues that this Court abused its discretion when it denied Petitioner's motion for an extension of time to file a new trial motion. [CV Doc. 1 at 53-54]. This claim plainly fails. Petitioner "cannot 'circumvent a ruling … on direct appeal by re-raising the same challenge in a § 2255 motion.'" Dyess, 730 F.3d at 360 (quoting United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009)); see Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (claims considered on direct review may not be "recast under the guise of collateral attack"). As such, Petitioner's challenge to this Court's denial of his motion for extension of time is barred because the Fourth Circuit rejected it on direct appeal, finding that the Court did not abuse its discretion. See Farris, 834 F. App'x at 812-13.

## V. CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's Section 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1.     Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] is **DENIED** and **DISMISSED**.

2.     Petitioner's Pro Se Motion for Leave to File Oversize Brief [Doc. 4] is **GRANTED** in accordance with the terms of this Order;

3.     Petitioner's Pro Se "Motion for Leave to File Petitioner's Memorandum of Law in Support of his 2255 Motion to Vacate, Set Aside, and Correct His Sentence" [Doc. 5-1] and Petitioner's Pro Se "Motion and Incorporated Memorandum for Leave to Supplement 2255 Motion Pursuant to Federal Rules of Civil Procedure 15(c)(1)(B)" [Doc. 8], which the Court construes as motions to amend his Motion to Vacate, are **DENIED** in accordance with the terms of this Order;

4.     Petitioner's Pro Se "EX Parte Motion For Order For Production of Billing Details in the Garlin Raymond Farris Criminal Case" [Doc. 6] is **DENIED** as moot; and

5.     Petitioner's Pro Se Motion for Leave to Supplement Exhibits in Petitioner's Reply Brief [Doc. 13] is **GRANTED**.

6.     **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability.  See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive

procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: August 8, 2023

Robert J. Conrad, Jr.
United States District Judge